UNITED STATES, Appellee,

v.

Claude S. JONES, Defendant, Appellant.

No. 99–1005.

United States Court of Appeals, First Circuit.

Submitted May 5, 1999.

Decided Aug. 12, 1999.

Thomas G. Briody, by appointment of the Court, on brief, for appellant.

Margaret E. Curran, United States Attorney, and Alicia M. Milligan, Assistant United States Attorney, on brief, for appellee.

Before SELYA, Circuit Judge, KRAVITCH,* Senior Circuit Judge, LIPEZ, Circuit Judge.

KRAVITCH, Senior Circuit Judge.

Defendant-appellant Claude Jones was convicted of possessing and passing counterfeit United States currency with intent to defraud in violation of 18 U.S.C. §§ 472 and 2 and conspiring to commit those acts in violation of 18 U.S.C. § 371. His exclusive ground for appeal is the district court's refusal to grant his motion to suppress evidence seized at the time of his arrest. We conclude that the district court properly denied Jones's motion to suppress and therefore affirm his conviction.

## I.  FACTS[1]

At approximately one o'clock in the morning on January 10, 1998, Rhode Is-

---

* Of the Eleventh Circuit, sitting by designation.

1. We take these facts from the testimony at the suppression hearing and the district court's ruling at the conclusion of that hearing. *See United States v. McCarthy,* 77 F.3d 522, 525 (1st Cir.1996) ("[W]e recite the facts as found by the district court to the extent that they derive support from the record and are not clearly erroneous. Where specific findings are lacking, we view the record in the light most favorable to the ruling, making all reasonably supported inferences." (citation omitted)). Because the district court rejected the conditional plea agreement between the

land state troopers Thomas Underhill and Timothy Sanzi, who were partners patrolling interstate highway 95 in a police cruiser, received a radio broadcast from trooper Dennis Flemming. Flemming had received a telephone call at the police barracks from a clerk at a convenience store located just off of interstate 95. Flemming asked Underhill and Sanzi to respond to the convenience store and stated that:

> The clerk just called, said that ... two gentlemen just passed a counterfeit twenty dollar bill to his store. He said he didn't realize it until after they left. They left approximately five minutes ago. The only description on the ... subjects and the vehicle is ... they were two black male subjects in a mid–90s car, '93 or '95 Oldsmobile, maybe a Buick. Unknown direction.

Instead of going to the convenience store, however, Underhill and Sanzi took up a position in a paved turnaround approximately five to seven miles north of the exit where the convenience store was located, facing the northbound lanes of interstate 95.

Just after they pulled into the turnaround, they received a "signal one" broadcast over the radio, which several troopers testified is a request to call the barracks. Sanzi called Flemming on Underhill's personal cellular telephone and learned the following additional information: (1) that the car was white or light-colored; (2) that one of the men was wearing a black leather jacket; and (3) that one of the men had purchased a bottle of spring water. During this telephone conversation, Underhill and Sanzi saw another patrol unit stop a car south of their position ("the initial stop"). They observed two troopers exit the patrol car and approach the driver and passenger side windows of the stopped car. After one or two minutes, the two troopers returned to their vehicle, and both cars pulled back onto the highway. When the vehicle passed the turnaround where Underhill and Sanzi sat, they observed that it was a white Lexus sedan, that the driver and passenger were black males, and that the driver was wearing a dark-colored leather jacket. Close to this time, the other patrol vehicle pulled into the turnaround next to Underhill and Sanzi, who asked the other troopers whether they had heard the radio broadcast concerning the passing of counterfeit money. The other troopers stated that they had not heard the transmission.[2] Underhill and Sanzi then decided to stop the Lexus again.

Underhill and Sanzi pulled the Lexus over in the emergency lane of interstate 95 ("the Underhill/Sanzi stop"). Underhill approached the driver's side of the car, while Sanzi walked up to the passenger side, where Jones was sitting. Sanzi asked Jones for identification, which Jones produced in the form of a New York correctional officer identification card that he wore in a leather holder that hung around his neck. When Sanzi asked for additional identification, Jones searched his pockets several times, stating that he was looking for his wallet. Sometime during this exchange, Sanzi again noted that the driver was wearing a black leather jacket; he also observed unopened bottles of spring water on the floor at Jones's feet.

After Jones failed to produce any further identification, Sanzi requested that he step out of the vehicle and asked him a

government and Jones that would have allowed Jones to appeal the district court's denial of his motion to suppress, Jones went to trial to preserve his right to appeal that order. He waived his right to a jury trial and, at his bench trial, stipulated to the evidence presented at the suppression hearing. In Part II.A, we address Jones's challenge to the credibility of the witnesses who testified at the hearing.

2. The other troopers had stopped the Lexus for speeding but decided not to issue a citation when Jones produced identification showing that he was a New York correctional officer.

series of questions, inquiring about where Jones and the driver were coming from, where they were headed, and whether they had made any recent stops. Jones answered these questions, stating that they had just stopped at a convenience store. Sanzi inquired as to whether they had made any purchases, to which Jones replied that they had bought a bottle of water. When Sanzi asked how they had purchased the water, Jones responded by removing some bills from his pocket, showing them briefly to Sanzi, and quickly returning them to his pocket. Sanzi stated, "Let me see that money," and as Jones again removed the bills from his pocket, Sanzi reached over and examined them. He immediately determined that they were counterfeit U.S. twenty-dollar bills based upon the quality of the paper and printing and the lack of a metal strip or double silhouette watermark. Sanzi held the bills up to Underhill, indicating that they were counterfeit, and arrested Jones, placing handcuffs on him and reading him *Miranda*[3] warnings.[4] A search of the car revealed three unopened bottles of spring water (two on the floor on the front passenger side and one in the back) and 61 more counterfeit twenty-dollar bills, similar to those that Jones removed from his pocket, stuffed between the passenger seat and the center console. Additional investigation revealed that Jones was the registered owner of the vehicle.

## II. DISCUSSION

■ We review findings of fact that a district court makes at a suppression hearing for clear error. *See, e.g., United States v. Cruz Jiménez*, 894 F.2d 1, 7 (1st. Cir.1990). Where evaluations of witnesses' credibility are concerned, we are especially deferential to the district court's judgment; we may overturn its decision only if, after reviewing all of the evidence, we have a "definite and firm conviction that a mistake has been committed." *United States v. Rostoff*, 164 F.3d 63, 71 (1st Cir.1999) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). We subject the district court's "ultimate constitutional conclusions to plenary review." *United States v. Sowers*, 136 F.3d 24, 26 (1st Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998).

## A. The District Court's Credibility Determination

■ Pointing to several inconsistencies in the troopers' testimony at the suppression hearing, their grand jury testimony, and the reports they filed immediately following his arrest, Jones argues that the district court erred in finding the troopers to be credible witnesses at the suppression hearing. Although Jones cites a number of minor discrepancies in the troopers' testimony, he focuses upon three issues that he contends demonstrate that the district court's credibility determination was patently incorrect.

First, he discusses Sanzi's admission that he completed two witness statements regarding the investigation and arrest, both of which state that Sanzi prepared them at 6:30 a.m. on January 10, 1998. The statements include the same general account of the events, but some details differ. In particular, one report states that Flemming gave all of the information that the store clerk provided in the initial radio transmission, while the other describes the request for the "signal one" and Sanzi's subsequent call to Flemming in which he received further information. At the suppression hearing, Sanzi admitted that he could not have prepared the reports simultaneously, but he gave confusing testimony about which report he prepared first, indicating that he did not

---

**3.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** Underhill also arrested the driver at this point. The driver originally was a co-defendant in this case, but he pleaded guilty and has not appealed any aspect of his case.

clearly remember this sequence of events. Sanzi also initially denied having listened to the tape of Flemming's broadcast between preparing the first and second reports but later conceded that he might have listened to the broadcast tape.

Second, Jones points out that three troopers gave different accounts of the distance between the turnaround where Underhill and Sanzi parked to observe traffic and the location of the other troopers' initial stop of the Lexus, and of the lighting of Underhill and Sanzi's cruiser. Underhill claimed that the distance between his cruiser and the initial stop was less than 500 feet; Sanzi contended that they were 300 yards away; and one of the troopers who made the initial stop estimated the distance at approximately one-half mile. In addition, although Sanzi and Underhill both mentioned numerous bright lights on their patrol car that improved their visibility, the other trooper stated that he did not see Underhill and Sanzi's cruiser parked in the turnaround during the initial stop.[5] According to Jones, these discrepancies cast doubt upon Underhill and Sanzi's ability to discern the Lexus, both when the other troopers stopped it and when it passed them as they sat in the turnaround.

Finally, Jones argues that Sanzi's testimony regarding Jones's response to Sanzi's question about how he paid for the bottle of water is patently unbelievable. According to Jones, Sanzi's description of these events is inconsistent with expected human behavior; in response to a question about how a person paid for an item, the typical person would reply verbally. It simply does not make sense, Jones contends, that he would remove counterfeit bills from his pocket and show them to Sanzi.

After reviewing the record of the suppression hearing in its entirety, we cannot say that the district court erred in its assessment of the troopers' credibility. Although we acknowledge the inconsistencies that Jones points out in the troopers' testimony, the district court explicitly took these discrepancies into account in making its ruling.[6] We also note that the points upon which the troopers' testimony differed—either from prior reports or from each other's accounts—generally were collateral facts not central to establishing whether the troopers had a reasonable suspicion that justified stopping the Lexus, whether they had probable cause to arrest Jones, or whether they violated his Fourth or Fifth Amendment rights in the process.

For example, although Underhill, Sanzi, and the trooper from the other cruiser gave different estimates of the distance from the turnaround to the location of the first stop, the first stop was not relevant to the issue of the likelihood that the Lexus

---

**5.** Sanzi and Underhill both testified that the cruiser's headlights and powerful overhead lights were on; Sanzi also mentioned a spotlight.

Jones contends that the trooper involved in the first stop testified that he "could not see where Sanzi and Underhill were parked." In fact, however, the transcript reveals that although the trooper first responded "no" when asked whether he could see Underhill and Sanzi's patrol car, after the next question, he appeared to clarify his prior answer by stating simply that he *did* not see the cruiser during the initial stop. The trooper never said that it was not possible to see the cruiser parked in the turnaround from the location of the initial stop.

**6.** The district judge stated:

Now I have had the opportunity to observe both Officers Sanzi and Underhill testify. I have had the opportunity to observe their demeanor while they testified. I have also had the benefit of counsel's very adept cross-examination where they pointed up certain discrepancies between what was in reports, what was stated from the witness stand, what was stated before the grand jury at a point in time much closer to these events than today, since we're now about six-and-a-half months away from this particular arrest. And I acknowledge that human beings forget things. Human beings don't always see things the same way. And human beings may say something one day and may say something completely different the next day.

was the counterfeiters' car. On the core facts—the length of time that had passed since the alleged passing of the counterfeit bill, the approximate distance from the convenience store to this area of the highway, whether the troopers who originally stopped the Lexus had heard the broadcast concerning the counterfeit bill, and the extent to which the vehicle and its passengers matched the descriptions they had received from Flemming—Underhill and Sanzi gave consistent testimony that also tracked the reports they filed immediately following the arrest. Likewise, that Sanzi gave confusing testimony regarding which witness report he prepared first and whether he listened to the broadcast tapes before preparing one of the reports does not detract from the more important point that the key information contained in those reports was identical and matched Sanzi's testimony at the suppression hearing. Finally, Jones's atypical response to Sanzi's question about how he paid for the bottle of water was not, in itself, a reason for the district court to discredit Sanzi's testimony. We find no clear error in the district court's credibility determination.

## B. The Underhill/Sanzi Stop

■ Jones contends that Underhill and Sanzi's decision to stop the Lexus was not justified. He points out that the troopers did not have any information to support the convenience store clerk's allegation that the bill he received was counterfeit. Furthermore, Jones argues that the clerk's description was vague, that the make of his car was different from the vehicle the clerk described, that the clerk did not know the direction in which the suspects' car was traveling, and that Underhill and Sanzi did not have an opportunity to observe the Lexus and its occupants sufficiently to link them to the counterfeiting incident.

■ The Fourth Amendment protects all persons "against unreasonable searches and seizures." U.S. Const. amend. IV. Although police detention of a person constitutes a "seizure,"[7] the Supreme Court long has recognized that some such detentions are permissible under the Fourth Amendment, even when the officer making the stop has neither a warrant nor probable cause for arrest. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (approving police officer's stopping of persons when officer could "point to specific and articulable facts" that "reasonably warrant[ed the] intrusion," despite absence of arrest warrant or probable cause for arrest). In more recent cases, the Court has extended this basic principle of Terry—originally espoused in the context of an officer stopping persons on foot who appeared to be preparing to commit a crime—to stops of persons in automobiles, see Berkemer v. McCarty, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), and to investigations of completed, rather than ongoing, criminal activity, see United States v. Hensley, 469 U.S. 221, 227–29, 105 S.Ct. 675, 679–80, 83 L.Ed.2d 604 (1985).

In this case, at the time Underhill and Sanzi made the decision to stop Jones's vehicle, they knew that, given the time that had elapsed since the alleged passing of the counterfeit bill and the distance from their location to the convenience store, had the suspects headed north on interstate 95, they probably would have been in the vicinity about the time Underhill and Sanzi spotted the Lexus. Underhill and Sanzi also had received a general description of the vehicle and the suspects: a white or light-colored late-model car, possibly a Buick or Oldsmobile, occupied by two black males, one wearing a black

7. The Supreme Court has held that "seizure" requires either "application of physical force to restrain movement" or a show of authority to which the subject submits. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991). Here, the parties apparently agree that stopping the car and directing Jones to exit the vehicle constituted a seizure of Jones, presumably of the latter type described in *Hodari D.*

leather jacket. Under these circumstances, when a white Lexus containing two black males, one wearing a black leather jacket, passed the cruiser, and when they learned that the troopers who made the initial stop had not known of the counterfeiting incident, we are satisfied that Underhill and Sanzi's decision to stop the car and investigate further was justified. *Cf. United States v. McCarthy*, 77 F.3d 522, 530 n. 8 (1st Cir.1996) (where witnesses reported previously seeing certain car at site where police found vehicle used to flee scene of bank robbery, "close proximity in both distance and time to the ... robbery combined with the fact that [the car police spotted] identically matched the description of the vehicle the suspects were reported to be driving [were] articulable and specific facts that clearly gave rise to the reasonable suspicion needed to justify the initial stop," even though officers had no description of the suspects themselves).

We reject Jones's arguments that certain holes in the body of information linking the counterfeiting incident to this vehicle rendered the troopers' decision to stop the car unreasonable. Underhill and Sanzi did not need specific facts supporting the store clerk's ability to discern a fake twenty dollar bill from a real one. Store clerks' jobs center upon the exchange of money, and for investigatory purposes, the troopers reasonably relied upon Flemming's radio broadcast concerning the alleged counterfeiting incident to look for persons fitting the clerk's description. Furthermore, the fact that the vehicle left in an unknown direction does not negate the troopers' knowledge that the convenience store was located just off of the interstate and their reasonable inference that the car likely entered this highway when it left the store. That the make of Jones's car did not match the clerk's description also is not determinative considering that Flemming's broadcast indicated that the clerk was not sure about the make.

In short, the specific facts that the troopers knew and the reasonable inferences that they drew from those facts—the proximity of the convenience store to their location, the approximate time the crime occurred, the likelihood that the car would be traveling on the interstate, the color of the car, the description and number of occupants, and one suspect's clothing—together with their observations of the Lexus and its occupants as they passed the troopers' cruiser, created a reasonable suspicion that the car's occupants had been involved in the counterfeiting incident. Because this information was sufficient to justify the stop, the absence of additional facts that may have created even stronger suspicion of Jones's criminal activity does not factor into our analysis.

## C. Sanzi's Questioning of Jones

After directing Jones to step out of the car, Sanzi asked him a series of approximately six questions, beginning with inquiries about Jones's travels and culminating in Sanzi asking to see the money Jones had flashed from his pocket in response to the previous question. When Sanzi examined these bills and determined that they were counterfeit, he arrested Jones and read him the *Miranda* warnings. Jones argues that Sanzi's questioning was a custodial interrogation that produced inculpatory responses from Jones in violation of his Fifth Amendment privilege against self-incrimination; he contends that the law required Sanzi to give Jones *Miranda* warnings before questioning him. According to the government, however, the pre-*Miranda* questions were proper because Jones was not in custody until Sanzi formally arrested him.

Jones concedes that *Miranda* applies only to custodial interrogations; our analysis, therefore, focuses upon whether Jones was in custody at any point during this initial questioning. The decisive issue in the custody inquiry is "whether there was a formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (internal punctuation and quotation omitted). In making this determination, we engage in a fact-specific inquiry, evaluating all of the circumstances surrounding the incident. Although no single element dictates the outcome of this analysis, factors that we consider in deciding whether a defendant was in custody at the time of questioning include: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987) (quotation omitted).

In the present case, the totality of the circumstances indicates that Sanzi's questions of Jones did not constitute a custodial interrogation. Although the location apparently was not familiar to Jones and the area was not well-lit, a public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse. *Cf. Berkemer*, 468 U.S. at 438–39, 104 S.Ct. at 3149–50 (in refusing to require *Miranda* warnings prior to formal arrest of suspect questioned pursuant to traffic stop, observing that public nature of traffic stop "reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements" and offsets "aura of authority surrounding an armed, uniformed officer" that may intimidate a motorist). In addition, Jones was with a companion, and only one trooper questioned each of the suspects. Sanzi did not subject Jones to any physical restraint; his only requirement of Jones with respect to his physical position was that Jones exit the car, a direction that Jones does not challenge on this appeal. Sanzi furthermore testified that he used a normal tone of voice when questioning Jones. Finally, Sanzi stated that the duration of the stop and questioning was brief—two to three

minutes from the initiation of the stop to the formal arrest—a time frame that seems reasonable given the events that occurred during that period. *Cf. United States v. Quinn*, 815 F.2d 153, 157–58 (1st Cir.1987) (concluding that *Miranda* warnings were not required at any time during 20–25 minute period in which officers continued to interrogate suspects).

We further observe that Sanzi implemented the purpose of a *Terry* stop by using the short period of questioning to confirm or allay his suspicions about Jones's connection to the reported counterfeiting incident. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3150 ("The stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.") (internal punctuation, quotation, and citation omitted); *see also Sowers*, 136 F.3d at 27 (noting that "*Terry* sanctions a brief detention of an individual to confirm or allay a police officer's reasonable suspicions" and approving officer's separate questioning of driver and passenger of car during 30 minute stop that eventually led to discovery of contraband). In this case, Sanzi asked Jones only a few questions, all of which related directly to his justification for initiating the stop: his reasonable suspicion that the vehicle's occupants might have been involved in the counterfeit bill-passing incident.

Jones incorrectly argues that whether the stop complied with *Terry* is irrelevant to the *Miranda* analysis because *Terry* involved a Fourth Amendment challenge, whereas *Miranda* concerns the Fifth Amendment. Although the *Terry* case itself did not explicitly address the effect of an investigative stop and inquiry upon an individual's Fifth Amendment right against self-incrimination, the Supreme Court since has recognized that a valid *Terry*

stop, including brief questioning relevant to the reasonable suspicions that prompted the officer to detain the individual, does not run afoul of the Fifth Amendment. *See, e.g., Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150 ("The comparatively non-threatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.*"). Examining the totality of the circumstances, we conclude that Jones was not in custody until Sanzi formally placed him under arrest. The short series of questions that Sanzi posed to him, therefore, were not part of a custodial interrogation and did not violate the requirements of *Miranda.*

### D. Sanzi's Seizure of the Counterfeit Bills

Jones further contends that Sanzi's warrantless seizure of the counterfeit bills that Jones removed from his pocket violated the Fourth Amendment. He argues that Sanzi already had conducted a pat-down search for weapons pursuant to *Terry,* which allows a "frisk" for weapons in the interest of the officer's safety, *see Terry,* 392 U.S. at 23–31, 88 S.Ct. at 1881–85. Jones reasons that upon completion of the pat-down search, which revealed no object that Sanzi could have determined was a potential threat to his safety, Sanzi could not seize any items from Jones unless he first obtained a warrant. The government does not contend, however, that Sanzi lawfully seized the money pursuant to a *Terry* frisk for weapons; it argues, rather, that the seizure simply was a reasonable step in the lawful *Terry* investigation that the troopers conducted to determine whether their suspicions were justified.

■ As we already have concluded, *see supra* Part II.C., Sanzi's questions to Jones were an appropriate part of the investigative stop. In response to Sanzi's inquiry regarding how Jones paid for his purchases at the convenience store, Jones removed several bills from his pocket and quickly replaced them. The question that

Jones's Fourth Amendment challenge presents, therefore, is a narrow one: whether, having briefly seen bills that Jones implicitly claimed related to the purchase of a bottle of water at the convenience store, Sanzi violated the Fourth Amendment by asking Jones to remove the bills from his pocket again and by seizing the money when Jones complied. We conclude that these events did not violate Jones's constitutional rights.

■ The Supreme Court has recognized a "general rule that warrantless searches are presumptively unreasonable," *Horton v. California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990), while simultaneously acknowledging "a few specifically established and well-delineated exceptions" to this rule, *id.* at 133 n. 4, 110 S.Ct. at 2306 n. 4 (internal quotation omitted). *See also Texas v. Brown,* 460 U.S. 730, 735–36, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (plurality opinion) (collecting cases recognizing "common-sense exceptions" to the warrant requirement, including hot pursuit, exigent circumstances, automobile searches, searches incident to arrest, border searches, and consent). Among these exceptions is the "plain view doctrine," the three elements of which the Supreme Court has discussed in a number of cases involving different factual scenarios. We address each of these elements and its application to this case in turn.

First, the officer must lawfully have reached the position from which he plainly could view the seized object. *See, e.g., Horton,* 496 U.S. at 136, 110 S.Ct. at 2308 ("an essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"); *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (initial warrantless intrusion must be lawful) (citation omitted); *Brown,* 460 U.S. at 739, 103 S.Ct. at 1542 (plurality opinion) (officers may seize prop-

erty without a warrant if they perceive it while engaged in a lawful activity). Sanzi's actions unquestionably satisfy this element of the plain view doctrine because, as we already have discussed, reasonable suspicion justified the troopers' decision to stop the car, and Sanzi did not violate the law by directing Jones to exit the vehicle or by questioning him. All of these actions constituted appropriate investigative steps in a lawful *Terry* stop, a context in which the Supreme Court has recognized that officers may lawfully seize contraband they observe despite the absence of a warrant. *See Minnesota v. Dickerson,* 508 U.S. 366, 374, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993) ("[P]olice officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search."); *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983).

■ Second, the seizure must satisfy the probable cause standard, *see Soldal v. Cook County,* 506 U.S. 56, 66, 113 S.Ct. 538, 546, 121 L.Ed.2d 450 (1992); *Hicks,* 480 U.S. at 326, 107 S.Ct. at 1153,[8] and in the context of a *Terry* stop, the officer must be "acting within the lawful bounds marked by *Terry* at the time he gained probable cause," *Dickerson,* 508 U.S. at 377, 113 S.Ct. at 2138. In *Brown,* the Court expounded upon the requirements of probable cause:

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not de-

mand any showing that such a belief be correct or more likely true than false. 460 U.S. at 742, 103 S.Ct. at 1543. In that case, a police officer who had stopped a vehicle at a random license checkpoint saw the driver drop a knotted balloon onto the floor as the officer approached the car. When the driver opened the glove box to look for his license, the officer changed his position to get a better view of the compartment and saw that it contained loose white powder, small plastic vials, and a bag of balloons. The Court held that the officer, who through experience with drug cases knew that offenders frequently used balloons of this type as drug containers, lawfully seized the balloon that the driver had dropped onto the floor of the vehicle.

Applying the standard described above to the facts of the case before us, we conclude that at the time Sanzi first saw the bills that Jones removed from his pocket, he had probable cause to believe that they were either contraband or evidence of the counterfeiting crime. At this point, Sanzi knew that the Lexus's occupants, clothing, and contents, and to some extent the car itself, bore a remarkable resemblance to the store clerk's description of the suspects. Calculating for time and distance, Jones's proximity to the convenience store increased the likelihood that he was involved in the crime. Jones's responses to Sanzi's questions about his travels, stops, and recent purchases corroborated Sanzi's growing suspicion, as did Jones's replacement of the bills in his pocket only a brief moment after removing them. On the basis of all of this information, Sanzi had probable cause to believe either that the bills Jones had shown him were counterfeit or that the money was evidence of the crime,[9] thereby satisfying

8. Some cases have described this element of the plain view doctrine as a requirement that the "incriminating character" of the seized object be "immediately apparent" when the officer views it. *See, e.g., Horton,* 496 U.S. at 136, 110 S.Ct. at 2308 (internal quotation omitted). Most recent cases use the clearer "probable cause" language, however, and at least one case criticizes the "immediately ap-

parent" characterization as "an unhappy choice of words" that may "imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Brown,* 460 U.S. at 741, 103 S.Ct. at 1543.

9. For example, Sanzi reasonably could have believed that the bills that Jones removed

the second element of the plain view doctrine.

Finally, the plain view exception to the warrant requirement necessitates that the officer "have a lawful right of access to the object itself." *Horton*, 496 U.S. at 138, 110 S.Ct. at 2308.[10] The Supreme Court repeatedly has recognized that officers have a right of access to contraband that they discover while acting within the bounds of a lawful *Terry* investigation. *See, e.g., Long*, 463 U.S. at 1050, 103 S.Ct. at 3481 (citing plain view doctrine cases in support of proposition that "[i]f, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."); *Brown*, 460 U.S. at 738 & n. 4, 103 S.Ct. at 1541 & n. 4 (noting that police have legal access to property that they "come across ... while acting pursuant to some exception to the Warrant Clause" and citing *Terry* as one example). In the present case, Sanzi acted properly when he asked Jones to remove the bills from his pocket again after Jones had replaced them. Pursuant to this lawful *Terry* investigation, therefore, Sanzi had legal access to the bills and justifiably seized them.

Because Sanzi's seizure of the counterfeit bills satisfied all three elements of the plain view doctrine, it did not violate the Fourth Amendment despite the absence of a warrant. Furthermore, as we have found that the district court did not err in finding the troopers' testimony credible or in ruling that none of their actions violated

Jones's constitutional rights, we conclude that the court properly denied Jones's motion to suppress.

**AFFIRMED.**

could be legitimate currency that he received in change from a purchase he made with a counterfeit bill.

10. It is important to distinguish this element from the first factor: a useful example is a situation in which an officer, from a vantage point on public land, sees marijuana plants growing on private property. The officer may not seize the plants (at least under the plain view doctrine) absent a warrant, because al-

though he has satisfied the first element—he lawfully is in a position to see the contraband—he does not have legal access to the marijuana because reaching it would require trespassing onto private property. *See Horton*, 496 U.S. at 137 & n. 7, 110 S.Ct. at 2308 & n. 7 (describing how warrantless trespass onto private property defeats this element of the plain view doctrine).