UNITED STATES of America,
Appellant,

v.

George E. LOTT and Edward Turner,
Defendants, Appellees.

No. 88–1739.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1989.

Decided March 22, 1989.

As Amended March 28, 1989.

Paul V. Kelly, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for U.S.

Sharon Beckman with whom Andrew H. Good, by Appointment of the Court, Ann L. Strayer, Silverglate, Gertner, Fine & Good, David L. Kelston, by Appointment of the Court, and Geller & Kelston, Boston, Mass., were on brief, for appellees.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

The United States appeals the district court's suppression of evidence prior to the trial of defendants, George Lott and Edward Turner. Both defendants were indicted on two counts: (1) possession of firearms by a felon, 18 U.S.C. § 922(g)(1); and (2) interstate transportation of stolen firearms, 18 U.S.C. § 922(i). The district court suppressed evidence, including the weapons, discovered at a roadside search because the search violated the fourth amendment and the teachings of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. We affirm.

## I. FACTS

The facts are derived mainly from the district court's findings of fact which a review of the record shows are not clearly erroneous. Pelham, New Hampshire is a town in southern New Hampshire just over the Massachusetts border. At approximately 3:00 a.m. on March 9, 1987, Officer Andrew McNally and Special Officer Shawn Casey[1] of the Pelham Police Department noticed a car which failed to stop for a stop sign. The car was not speeding or otherwise driving erratically. Upon further inspection, the officers noticed that a rear tail light was broken, the license plate was hanging off slightly and the trunk was flapping. A check of the license plate revealed that the car was not stolen. When the car slowed down but did not stop for a second stop sign, the officers signaled for the car to pull over; the driver, defendant George Lott, complied.

Once the cars were stopped, Lott exited the car and approached the police cruiser. McNally put the cruiser in reverse and told Lott to return to his car. Lott said "everything is all right," returned to his car and started to drive away. McNally then radioed to another car and took off after Lott. Lott was not speeding or otherwise attempting to evade the police. When he saw the two cruisers following him and signalling for him to stop, he did so.

Officer Evan Haglund, the sole officer in the second car, shouted to Lott and his passenger, defendant Edward Turner, to place their hands on the dashboard. They complied, and McNally approached the driver's side while Casey went to the passenger's side. While passing the open trunk, McNally looked in but saw nothing. On the back seat of the car he noticed a pair of bolt cutters. At some point a glass cutter was also seen. Upon reaching the driver's side of the car, McNally observed "blood pouring out of [Lott's] arm." McNally asked Lott for his license and registration. These were produced and were in order. McNally then asked Lott the cause of the injury. Lott stated that Turner's "bitching sister" had stabbed him with a fork. Turner then stated[2] that it was not his sister but rather a "whore" who stabbed Lott.

Lott was ordered out of the car. McNally then removed, over Lott's protests, a

---

1. A "special officer" is a part-time officer.

2. As the district court noted, there were discrepancies in the police officers' testimony as to these statements including whether Turner spoke in response to a question from the police or on his own.

bandana covering one of his wounds[3]. The removal of the bandana was not for the purpose of looking for hidden weapons. Over Lott's further protests, an ambulance was called. While they waited, the officers placed bandages on Lott's wounds. Turner, who was still sitting in the car, was asked for identification. He produced a Massachusetts learner's permit and a social security card which were also in order. McNally, still in possession of both men's identifications, went back to his cruiser to check for outstanding arrest warrants.

When the ambulance arrived, Lott again stated that he did not want treatment—he wanted to see his own doctor. He signed a release to that effect and no treatment was administered—they merely rebandaged the wounds. While Lott was being examined by the ambulance personnel, Casey signaled to Haglund, the senior officer at the scene, and told him that he thought Turner was attempting to hide something behind his back. Haglund ordered Turner out of the car. A brown paper bag fell to the seat. Haglund opened the bag and found it contained an unopened full bottle of gin. After the bag with the gin was put back in the car, Turner moved to get back in but was prevented from doing so by Haglund. Haglund continued his search by looking under the car seats. He found a handgun and shouted to McNally that he had found a gun. The defendants were asked if they had permits. Receiving no satisfactory answer, the defendants were arrested for firearms violations. They were both handcuffed and read the *Miranda* warnings. Haglund then continued his search of the car and found three more handguns. The guns were not loaded and no ammunition was found. It was later ascertained that all four guns had been stolen that evening from a gun shop in northern Massachusetts.

After their arrest, the defendants were frisked for weapons and none were found. At no time prior to their arrest had they been frisked. At all times Lott was able to walk and talk normally and respond to requests appropriately. At no time prior to the arrest for firearms violations was a traffic citation given or an arrest for traffic violations made.[4] The total time that elapsed from the second stop to the arrest was approximately 10–12 minutes.

Prior to trial, Lott and Turner moved to suppress all evidence and statements made during the stop including: the four weapons; glass and bolt cutters and other tools; blood samples and bandages; glass particles; and written and verbal statements. At a hearing on the motions, the government presented Officers McNally and Haglund as witnesses; the defendants called no witnesses.

The district court held that the initial stop of the car was justified and that the defendants were not subject to a *de facto* arrest requiring that the *Miranda* warnings should have been given earlier. It nonetheless held that the search of Lott's body (removing the bandana from his arm) and of the car violated the fourth amendment rights of the defendants because the police did not fear for their safety and thus, had no right to make the searches, relying on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, and *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The district court entered the following order:

I hereby ORDER that:

**3.** As we point out *infra,* Lott was subsequently examined by ambulance personnel and after his arrest taken to a hospital. The testimony at the hearing and the reports by the ambulance and hospital personnel indicate that there were lacerations to both of Lott's wrists. Although the record is unclear as to which wrist, one was injured more severely than the other and was covered with a bandana.

**4.** One arrest report indicates one of the three crimes Lott was arrested for was the stop sign infraction. Another report mentions only the firearms charges. The government did not contend below nor does it argue here that the search of the vehicle was a search incident to an arrest for a traffic violation. *See Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980) (where the fruits of the search are not essential to finding probable cause and an arrest follows quickly, a search incident to arrest may precede formal arrest).

(a) any evidence or observations of Lott's wound arising from Officer McNally's removal of the bandanna be suppressed at trial;

(b) any statements or information elicited after the search of Lott's wrist and deriving therefrom be suppressed as fruit of the poisonous tree; and

(c) that the four handguns seized beneath the passenger seat be suppressed.

## II. STANDING

Before we reach the merits, we must first address a preliminary issue. As the district court noted, "[t]he government stipulated that both defendants have standing to move for suppression."[5] In its brief before this court, the government seeks to limit its stipulation; to what extent, however, is unclear. Basically, it contends that because fourth amendment rights are personal, standing cannot be stipulated.

■ The government may not limit its stipulation for two reasons. First, when the government has stipulated to standing, thereby obviating the need for a defendant to present facts relevant to standing, it may not thereafter claim the defendant lacked standing. *See United States v. Hernandez*, 668 F.2d 824, 826 (5th Cir. Unit B 1982); *but see United States v. Blanco*, 844 F.2d 344, 349 n. 4 (6th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988). Second, the government never asked the district court for a modification or rescission of the stipulation. The government may not raise this issue for the first time on appeal. It is bound by its stipulation.

## III. THE SEARCH OF LOTT'S WRIST

In an apparent concession that the search of the cuts on Lott's wrist was not permissible under *Terry*, 392 U.S. at 1, 88 S.Ct. at 1868,[6] the government on appeal relies on the "community caretaker" exception to the fourth amendment in contesting the district court's ruling on this point. This exception recognizes that police officers are often called to investigate situations "in which there is no claim of criminal liability," and such investigations begin "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). If in the course of such an investigation, evidence of a crime is discovered, the "better view" is that the evidence is admissible. *See* W. LaFave, *Search and Seizure* § 5.4(c) (2d ed. 1987). The government's reliance on this exception fails for two reasons.

■ First, this basis for upholding the search was not raised below. "In the absence of extraordinary circumstances, none of which are apparent here, we have regularly declined to consider points which were not seasonably advanced below." *Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (collecting cases). The government claims that it was not aware that Lott was challenging the search of his body and that the judge *sua sponte* made this an issue. This claim is not borne out by the record. In his motion to suppress, Lott specifically stated that "the *search* and seizure *of his person* and effects was illegal, unreasonable, and

---

5. The colloquy at the outset of the hearing was as follows:

    MR. GOOD [Defendant Turner's attorney]: ... And for purposes of this hearing, the Government is going to stipulate that both Defendants have standing for purposes of the motion to suppress.
    THE COURT: All right. Is that the case, Mr. Kelly?
    MR. KELLY: Yes, that's a fair statement, your Honor....
    THE COURT: All right.
    MR. KELLY: Because we would want to just specify them a little more clearly for the record. But for purposes of this hearing, the

    Government concedes that both Defendants, who are charged with the crime of possession of firearms, certainly had a standing to challenge whether or not they were, in fact, in possession of those firearms.
    THE COURT: All right....

6. The search of Lott's bandaged arm cannot be considered a limited *Terry* frisk for weapons. The purpose of the search was to inspect the wound, *not* to disarm the defendant. At oral argument, the government admitted that the sole reason for ordering Lott out of the car was to examine his wound.

unconstitutional,...." (Emphasis supplied). If this is not a clear statement that the search of Lott's wrist was contested, the list of specific items to be suppressed resolves any questions. Lott included "all blood samples taken from defendant or his effects, as well as gauze or any bandages applied to defendant." This is strong evidence that the search of the bandaged wrist was in dispute. The government cannot at this stage claim a lack of notice; it should have presented its theories for upholding the search below.

■ Second, even if we were inclined to reach the merits of this issue, the government would fare no better. Cases employing the "community caretaker" exception uniformly deal with situations where there is concern for the *public* safety due to the potential for danger to people or property. *See, e.g., Cady,* 413 U.S. 433, 93 S.Ct. 2523 (policeman was hospitalized following an accident; other police officers feared that his revolver, which was not on him and which might be in his car, could cause harm); *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982) (upholding the warrantless search of a vacant house in which a burglary was presently suspected to be occurring), *adopted in relevant part on reh'g en banc,* 710 F.2d 431, 432 (1983); *United States v. Markland,* 635 F.2d 174 (2d Cir.1980) (recovery and inspection of packages with unknown contents following automobile accident), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981); *United States v. Newbourn,* 600 F.2d 452 (4th Cir.1979) (upholding, under *Cady,* the warrantless search of a car trunk for which there existed probable cause to suspect it contained weapons following arrest of defendants); *United States v. Miller,* 589 F.2d 1117 (1st Cir.1978) (upholding search of abandoned boat for purposes of securing property and checking for possible injured persons), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Nord,* 586 F.2d 1288 (8th Cir.1978) (police in investigating report that defendant had missed work and was intoxicated

in his apartment entered apartment without a warrant).

The government claims that there was a reasonable fear for public safety here since a large loss of blood by Lott could have led to a loss of consciousness causing an accident and injuring Lott, his passenger and any number of others. The problem with such a claim is that with the exception of going through one stop sign and rolling slowly through another, there is no evidence that Lott was incapable of driving. Lott had driven at a normal rate of speed in an unerratic fashion, twice responding appropriately to signals to pull over. He was able to walk, converse in a normal manner and to state he wanted his own doctor. Indeed, the ambulance personnel did not find the situation life threatening—they allowed Lott to sign a release and refuse to accept treatment. Nor did the police find the wounds particularly bad—they handcuffed Lott, took him to the station house and only then to a hospital. There being no threat to the public's safety, the community caretaker exception does not apply.[7] Moreover, the police did not know that Turner, 39 years old, had only a Massachusetts learner's permit until *after* the search of Lott's wrist. If the police were solely concerned with Lott's driving ability, they should have first ascertained whether Turner was able to drive.

## IV. THE SEARCH OF THE CAR

■ The government contends that the search of the car was valid under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 which extended *Terry,* 392 U.S. at 1, 88 S.Ct. at 1868, to include automobile "frisks."

The police officers did not frisk the defendants prior to searching the car and arresting them. There was no evidence to suggest that the police had reason to believe that the defendants were armed or that there were weapons in the car. As Officer Haglund conceded on cross-exami-

---

**7.** The "emergency life-saving exception," *see United States v. Dunavan,* 485 F.2d 201, 203 (6th Cir.1973), is also not applicable since, as de-

tailed in the text, there was no life threatening emergency.

nation, the search was for contraband, not just weapons. Based on this, the district court found that the officers did not fear for their safety.

We recently stated:

In reviewing the reasonableness of a *Terry* stop, a court must consider all of the relevant circumstances, which are not to be dissected and viewed singly; rather they must be considered as a whole. Such review encompasses two inquiries: first, whether the officers' action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place.

*United States v. Gilliard,* 847 F.2d 21, 24–25 (1st Cir.1988) (citations and quotations omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989).

In evaluating the propriety of a frisk for weapons, the Court has instructed:

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883 (citations and footnote omitted). In the companion case to *Terry,* the Court further developed the requirements for a frisk:

The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). In *Long,* 463 U.S. 1032, 103 S.Ct. 3469, the Court extended the area for which a valid *Terry* search could be made to include the interior of a car. If while conducting a valid *Terry* frisk, contraband other than weapons is found, the contraband is not subject to suppression. *Long,* 463 U.S. at 1050, 103 S.Ct. at 3481. But,

The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. *Nothing in Terry can be understood to allow* a generalized "cursory search for weapons" or, indeed, *any search whatever for anything but weapons.* The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.

*Ybarra v. Illinois,* 444 U.S. 85, 93–94, 100 S.Ct. 338, 343–44, 62 L.Ed.2d 238 (1979) (citations and footnote omitted; emphasis supplied). Indeed, the reason that a generalized search for contraband is impermissible derives from the purpose behind a *Terry* frisk.

The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.

*Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

Although *Terry* and *Long* speak in terms of an objective test ("reasonableness") for determining the validity of an officer's frisk for weapons, we do not read those cases as permitting a frisk where, although the circumstances might pass an objective test, the officers in the field were not *actu-*

*ally* concerned for their safety. Indeed, this point seems to be implicit in the Supreme Court's reasoning. *See, e.g., Long,* 463 U.S. at 1049, 103 S.Ct. at 3480 (a search for weapons is allowed "if the *police officer possesses* a reasonable belief") (emphasis added); *id.* at 1051, 103 S.Ct. at 3482 (police may search if *"they possess"* a reasonable belief) (emphasis added); *id.* at 1052 n. 16, 103 S.Ct. at 3482 n. 16 (in order to search, *"the officer must have* an articulable suspicion") (emphasis added); *Ybarra,* 444 U.S. at 93, 100 S.Ct. at 343 (a frisk is permitted by the officer when *"he* reasonably *believes or suspects"* the detainee to be armed) (emphasis added). An officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion.

Bolstering our conclusion that an officer must have an actual suspicion that weapons are present before a *Terry* search can be made are two further points. First, the Supreme Court and this court have consistently pointed to such facts. *See, e.g., Long,* 463 U.S. at 1036, 103 S.Ct. at 3473 (upon observing knife in car, officer frisked suspect and searched car for additional weapons); *Pennsylvania v. Mimms,* 434 U.S. 106, 107, 98 S.Ct. 330, 331, 54 L.Ed.2d 331 (1977) (per curiam) (officer performed *Terry* frisk fearing that bulge might be a weapon); *Williams,* 407 U.S. at 145, 92 S.Ct. at 1923 (officer was informed that suspect had a gun in his waist); *Terry,* 392 U.S. at 6, 88 S.Ct. at 1872 (officer feared the suspects might have a gun); *Sibron,* 392 U.S. at 46, 88 S.Ct. at 1894 (officer never suggested he searched out of a fear that suspect was armed and dangerous); *id.* at n. 4, 88 S.Ct. at 1874 n. 4 (same); *id.* at 64, 88 S.Ct. at 1903 (finding a *Terry* frisk invalid in part because officer did not fear suspect was armed and dangerous); *id.* at 21, 88 S.Ct. at 1879; *United States v. Trullo,* 809 F.2d 108, 110 (1st Cir.) (bulge in suspect's pocket), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *Ballou v. Massachusetts,* 403 F.2d 982, 985 (1st Cir.1968) ("the sole focus of suspicion here was that the suspects were armed"),

*cert. denied,* 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). Second, where a search has been made without any legal basis, we do not think that an ex post facto reconstruction based upon an argument of objective reasonableness can validate the search. While other officers might have viewed the situation differently, it is the conduct of these officers which we are judging.

■ Applying these principles to the present case, we begin by examining whether the stop by the police was justified. It is undisputed that the police had good cause to stop the car: it had failed to fully comply with two traffic signs; its license plate was in disarray; and one tail light was out. "The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection...." *Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979); *see also Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing routine traffic stops to *Terry* stops); *Mimms,* 434 U.S. at 109, 98 S.Ct. at 332.

The second prong of the analysis— whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place —is more difficult. The reason for the stop was a traffic violation. But, all facts gathered up to the time of the search of the car must be considered in analyzing the propriety of the search. *See Mimms,* 434 U.S. at 112, 98 S.Ct. at 334.

The facts known to the police up to the point of the search of the car were: (1) the driver had failed to obey two stop signs; (2) the driver had driven away from one attempt to stop him; (3) the driver's wrists were bleeding; (4) the driver wished to leave and be attended by his own physician;[8] (5) the driver and passenger made

---

**8.** The government contends that the wounds were suspicious. If anything, the wounds are

more indicative of Lott being a *victim* not a perpetrator of a crime. We also fail to see how

inconsistent statements concerning the wounds; (6) the passenger made an attempt to conceal something behind his back; (7) the "something" was a bag containing a full bottle of gin; and (8) the passenger made a move to return to the car. These facts do not point to any crime other than a traffic violation and any intrusion must be confined to that investigation or be based on the reasonable suspicion that the driver or passenger had weapons on them or weapons were in the car. The government repeatedly raises the spectre of the bolt cutters, glass cutters and other assorted tools. It fails, however, to explain how these tools of trade of many men are in any way suspicious. Such tools might have been suspicious had the police known of the gun store robbery earlier that evening and the means by which it was accomplished, but, here no such evidence was introduced. While the facts outlined above *might* be sufficient to justify the further search of the car under *Long,* here, three major reasons fatally undercut the validity of the search.

First, the police were not in fear for their safety. This is shown by the fact that neither defendant was frisked upon exiting the car (or at any subsequent time) until their arrest. If the police truly feared that the two were armed and dangerous or that Turner was concealing weapons by his movements, they would have made sure, by a *Terry* frisk, that the *defendants* were not armed and then have proceeded to search the car. *Cf. Long,* 463 U.S. at 1036, 103 S.Ct. at 3473 (upon seeing a knife in a car, police frisked suspect, who was outside of the car, first and then searched car). Thus, the claim that the police had a "reasonable" suspicion that the defendants were armed is belied by the fact that they were not frisked.

Second, the search was directed towards finding contraband. It was not a search for weapons only. This is improper under *Terry* and *Long.* The police may only conduct a *Terry/Long* search when looking for weapons. *Ybarra,* 444 U.S. at 93–94, 100 S.Ct. at 343–44 ("Nothing in *Terry*

can be understood to allow ... any search whatever for anything but weapons.").

Third, though the facts might permit conflicting inferences, the choice to be made was for the district court. The findings of fact made by the court are supported by the record. We have no basis, therefore, for overturning the findings of the district court.

This is not a case where the police had reason to suspect the presence of firearms based on the type of crime suspected. The only reason for the stop was a traffic violation. *See, e.g., Terry,* 392 U.S. at 28, 88 S.Ct. at 1883 (robbery); *Gilliard,* 847 F.2d at 25 (drug trafficking); *Trullo,* 809 F.2d at 113 (drug trafficking and bulge in pocket). At the time of the search, the police officers did not know of the gun store robbery or the means by which it was accomplished.

As the district court found: "This was not a search animated by concerns for safety; rather it was driven by the understandable—but unconstitutionally applied—curiosity of a seasoned police officer." The court did not err in finding the search violative of the fourth amendment.

## V.  CONCLUSION

The government is bound by its stipulation with respect to standing. The examination of Lott's wrist by removing his bandage and the search of the car were in violation of the fourth amendment. The suppression order entered by the district court is therefore

AFFIRMED.

The defendants' motion to strike portions of the government's appendix and brief is moot.

Lott's reasonable request to leave and see his . own physician is suspicious.