IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,212

STATE OF KANSAS,
*Appellee*,

v.

JOHN W. BANNON,
*Appellant.*

SYLLABUS BY THE COURT

Testimony about a law enforcement officer's actual, subjective belief about whether a person stopped is armed and presently dangerous, if any, may be one factor to consider when applying the objective reasonableness test used for evaluating the constitutionality of a frisk under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 11, 2015. Appeal from Sedgwick District Court; CHRISTOPHER M. MAGANA, judge. Opinion filed July 28, 2017. Judgment of the Court of Appeals reversing and remanding the district court is reversed, and the case is remanded to the Court of Appeals for reconsideration.

*Richard Ney*, of Ney & Adams, of Wichita, argued the cause, and *Ian M. Clark*, of Wichita, was with him on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

1

BEIER, J.: Defendant John W. Bannon appeals his conviction for criminal carrying of a firearm in the lobby of the Wheatshocker Apartments on the campus of Wichita State University (WSU).

The district court judge rejected Bannon's motion to suppress the gun found on him during a police patdown. The Court of Appeals reversed. We granted the State's petition for review. We now reverse the Court of Appeals and remand the case to the panel for reconsideration under the correct legal standard.

FACTUAL AND PROCEDURAL BACKGROUND

Sergeant Bryson Potter of the WSU Police Department received a complaint that a student at the Wheatshocker Apartments had a handgun. According to the complaint, the person was named "John" and was a "[w]hite male, about 5'10", skinny build, [and had] long brown hair" and lived in either Room 414 or Room 514. After receiving the complaint, Potter and Officer Phillip Shelite cleared a burglary alarm in another building on campus and traveled to Wheatshocker. While they drove, dispatch determined and reported to the officers that a person by the name of John Bannon lived in Room 414. Dispatch also contacted the front desk of Wheatshocker. The resident assistant on duty told dispatch that "they thought [Bannon] was in the front lobby at the time."

When the officers arrived at the building, they used their WSU identification cards to unlock the front doors. Once inside, Potter saw a man sitting in a chair who matched the description he had been given. The officers approached, and Potter asked if the man was John. The man, Bannon, said, "Yes." Potter asked Bannon if he had any weapons on him, and Bannon said, "No." At that point, Shelite "helped [Bannon] get up," had Bannon put his hands on his head, and patted him down. Shelite found a gun in Bannon's waistband.

2

Bannon was charged with criminal carrying of a firearm under K.S.A. 2012 Supp. 21-6302(a)(4), which prohibited knowingly carrying a firearm concealed on his person, when not on his land, in his abode, or in his fixed place of business.

Before trial, Bannon filed a motion to dismiss, arguing that he could not be convicted of the charged crime because he had carried the gun on his land or in his abode. After hearing arguments from both sides, District Judge John J. Kisner, Jr., denied the motion.

Bannon also filed a motion to suppress the gun, arguing that "[s]ince the common area of the apartment building, from which the general public was excluded by a locked door, was contained in the curtilage of the Defendant's apartment, the warrantless search of Defendant, in the absence of any exigent circumstances, was presumptively unreasonable." He also argued that the stop-and-frisk exception to the Fourth Amendment's warrant requirement under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), did not apply "because the Defendant was not in a public place at the time he was stopped and searched. Further, even if it did apply, the officers lacked a reasonable, articulable suspicion that the Defendant was involved in criminal activity at the time they seized and searched him." Finally, Bannon asserted, because "law enforcement officers did not have probable cause to believe the Defendant was committing a crime at the time he was seized and searched, his warrantless arrest cannot be upheld."

District Judge Christopher Magana held an evidentiary hearing on the motion. At the hearing, Jennifer Williams, a dispatcher for the WSU Police Department, and Officers Potter and Shelite testified.

3

Williams said she was on duty the evening Bannon was arrested. The parents of WSU student Johnathon Wasserstein came into the department and told her that "they wanted to speak with an officer regarding an incident that was reported to them that had occurred two weeks prior." As a result, Williams called Potter, the senior officer on duty, to the station.

While waiting for Potter to arrive, Williams overheard the Wassersteins "talking amongst themselves, saying [that the person they were complaining about] had reported he worked for Homeland Security; that their son had seen him with a .40 caliber-type Glock weapon; and that many comments had been made to their son that there was M16s in the trunk of a vehicle." At some point, the Wassersteins also gave Williams a description of the person in question: "white male, with a light brown colored leather type jacket, . . . sitting in a chair in the lobby . . . of Wheatshocker Apartments." The Wassersteins told Williams that their son had told them that it was "an everyday occurrence that this individual carries a weapon on him."

When Potter arrived at the station, he spoke to the Wassersteins. Potter testified that the father told him his son had said "someone at Wheatshocker worked for Homeland Security and carried guns all the time." Potter asked where the son was and if he could speak to him. The father said that they could go get their son and bring him back to the station, which the couple did.

After Johnathon arrived, Potter asked him "what was going on." Wasserstein told Potter

> "a friend of his or someone he hung out with named John told him that he worked for Homeland Security. He told him he did missions. He told me that he'd seen his gun—he

4

had two guns in a safe in his closet in his room. He said that he always had a gun on him[] as well, in his waistband."

Potter asked Johnathon when he had seen the guns in the safe. Potter testified that, based on the response, "it didn't seem to me that it was that day that he'd seen them in the safe. I asked him when did he have a gun on him, and he said he always has a gun on him." In addition to the guns in the safe, Johnathon told Potter that John had rifles in his car and that "there was a lot of ammunition" in the safe. When Potter asked Wasserstein whether John had a concealed carry license, Wasserstein told him that John had told him he did. According to Potter, at the time of the incident, carrying a concealed handgun in Wheatshocker Apartments was prohibited "both by law and by . . . university policy," even with a concealed carry license. Johnathon also told Potter that John used Xanax and morphine. Johnathon described John as "about [5'10"], skinny buil[d], long brown hair" and said he thought John lived in either Room 414 or Room 514 of Wheatshocker.

During the hearing, Potter was asked about his observations of Johnathon. Potter said he observed nothing to indicate that Wasserstein was under the influence of drugs or alcohol.

After dealing with the burglary alarm in another building, which took about 5 minutes, Potter headed to Wheatshocker. During cross-examination at the suppression hearing, Potter said he was "investigating several possible crimes[:] impersonating a . . . law enforcement officer, the carry of the gun illegally, and then the two prescription drugs that Mr. Wasserstein mentioned are often abused, so that was on my mind as well."

At Wheatshocker, Potter testified, he tried to speak to the front-desk worker, but she could not hear him. At about the same time, Potter noticed a person sitting in the

lobby who matched the description he had been given. He and Shelite approached the person.

> "We . . . asked him if his name was John. He said yes. Asked him if he had a weapon on him. He said no. Officer Shelite insisted on him standing up and putting his hands on his head and gave him a quick exterior patdown.
>
> . . . .
>
> "[H]e started patting him down on the outside of his shirt around the waistline and almost immediately pulled a handgun off of Mr. Bannon."

Potter admitted on cross-examination that he had not checked to see if Bannon had a concealed carry permit, although he could have. He reiterated his belief that, because Wheatshocker was a posted no-guns area, carrying a gun was illegal regardless of a permit. Potter also was asked about the last time Johnathon had seen Bannon with the gun; Potter did not know. Johnathon just said "[Bannon] always has a gun on him."

Potter confirmed that he did not have a warrant to go into Wheatshocker; that entrances are locked, preventing access by the general public; and that residents and authorized WSU employees use their WSU IDs as electronic passkeys to get into the building. Near the lobby, where Bannon was found, there are mailboxes for the residents. The building also includes other communal areas, such as laundry rooms. Bannon's room was on the fourth floor, and there was no direct connection between his room and the lobby.

The State's final witness at the suppression hearing was Shelite. He arrived at the station while the Wassersteins were bringing their son in. While Potter questioned Johnathon, Shelite "just observed and listened."

According to Shelite, when he and Potter reached Wheatshocker,

"[a]s we were walking in, Officer Potter gave a description of Mr. Bannon. And when we got into the front lobby, we noticed that Mr. Bannon was sitting down, meeting that description. And we walked over, and Officer Potter asked him if his name was John, to which he replied yes.

. . . .

"We asked John to stand up, and Officer Potter asked him if he had any weapons on him. He replied, [']No, what's going on.['] I asked him to place his hands on the back of his head. And I held onto his hands, both of his hands, with my left hand and told him that I was going to be just checking his waistband, the exterior of his clothing, with my hand.

. . . .

"I patted the exterior part of this clothing down. He had his shirt untucked, and I just patted around, starting from the front of the waistband and proceed around to the rear of—towards his back.

. . . .

"Behind his right shoulder, in the waistband, I felt a hard object which I was able to determine was [consistent] with a handgun."

Upon feeling the gun, Shelite "told Mr. Bannon, Do not make any sudden movements, and squeezed a little tighter to keep control of his hands, and lifted up his shirt and removed the, what ended up being a Sig Sauer P229."

At the conclusion of evidence, Judge Magana heard arguments and then announced and explained his ruling from the bench. He began with the subject of Johnathon's reliability. Despite some reservations, Judge Magana thought the information about Bannon carrying a gun was reliable. Although officers could have conducted a more thorough interview of Johnathon, it was not necessary in this case because the officers needed only reasonable suspicion rather than probable cause. Judge Magana then turned to determining whether the lobby where Bannon was found should be considered a public area or curtilage of his apartment. He ultimately concluded that Bannon did not

have a property right or an expectation of privacy in the lobby of Wheatshocker. Finally, the patdown was within the scope of *Terry* because the officers had reasonable suspicion that Bannon was carrying a gun, and they were entitled to search him to ensure officer safety. Judge Magana therefore denied suppression.

At trial, Potter and Shelite testified, explaining how they had found Bannon and what they had found on him. Their testimony was substantially similar to their testimony at the suppression hearing, and the jury found Bannon guilty.

Bannon advanced two arguments on appeal to the Court of Appeals: (1) Judge Magana erred in denying his motion to suppress; and (2) Judge Kisner erred in denying his motion to dismiss because Bannon could not be convicted for possessing a concealed gun in his abode or within its curtilage. The panel reversed, holding that the motion to suppress should have been granted. *State v. Bannon*, No. 112,212, 2015 WL 8588451, at *1 (Kan. App. 2015). It assumed without deciding that "the lobby of Wheatshocker was a public place and the officers had a reasonable suspicion Bannon was violating the law to satisfy the first prong of a *Terry* stop." 2015 WL 8588451, at *3. Turning to the second prong of *Terry*, that is, in the panel's words, whether the patdown was done because the officers "were concerned for their safety or the safety of others," the panel concluded that there was no evidence the officers were actually, subjectively concerned for their safety or the safety of others. 2015 WL 8588451, at *3-4.

"At the suppression hearing, the officers never testified they were concerned for their safety or the safety of others before proceeding with the warrantless pat-down search of Bannon. Clearly, the initial contact was reasonable as they approached Bannon. However, once this plays out, the record reflects Bannon was sitting in the lobby reading a book. The State clearly failed to present evidence of the second prong of a *Terry* stop— that the officers were reasonably concerned for their safety or for the safety of others to justify the move to a warrantless pat-down search. The right to proceed with a

8

warrantless search under a *Terry* stop is a two-step dance. The evidence is lacking on the second step—concern for officer or public safety—and the motion to suppress should have been granted." 2015 WL 8588451, at *4.

Because of its holding on the motion to suppress, the panel declined to address Bannon's second issue regarding the motion to dismiss. 2015 WL 8588451, at *4.

## DISCUSSION

Under *Terry*, law enforcement officers may stop and frisk a person in a public place if the officers reasonably suspect (1) criminal activity may be afoot and (2) the person being investigated is armed and presently dangerous. *Terry*, 392 U.S. at 30.

The general parameters of a *Terry* stop have also been codified in Kansas in K.S.A. 22-2402. *State v. Johnson*, 293 Kan. 959, 965, 270 P.3d 1135 (2012). It provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, such officer may take and keep it until the completion of the questioning, at which time such officer shall either return it, if lawfully possessed, or arrest such person."

Regardless of Kansas' statutory requirements for effecting an investigatory detention, the ultimate constitutionality of such a seizure is still measured against the

9

requirements of *Terry* and the Fourth Amendment. See *Sibron v. New York*, 392 U.S. 40, 60-61, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) ("New York is . . . free to develop its own law of search and seizure to meet the needs of local law enforcement . . . . It may not, however, authorize police conduct which trenches upon Fourth Amendment rights."). The statute's—and the Court of Appeals panel's—more general wording on officer safety would tend to broaden the universe of permissible searches. Compare *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (applying *Terry*, requiring reasonable suspicion that detainee is "armed and dangerous" to justify frisk), with *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015) (discussing government's "officer safety interest" in context of extending seizures during traffic stops, "'especially fraught with danger to police officers'"). In the context of searches incident to arrest, officer safety has long been an explicit concern. See *Riley v. California*, 573 U.S. __, 134 S. Ct. 2473, 2483, 189 L. Ed. 2d 430 (2014) (acknowledging officer safety justification for assessing reasonableness of search incident to arrest) (quoting *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 [1969]). Because the United States Supreme Court's wording of the second prong of *Terry* still focuses on whether the person stopped is armed and presently dangerous, we will continue to make that our focus as well.

For purposes of its analysis, the Court of Appeals panel assumed that the State had met its burden to show that the two WSU officers had a reasonable suspicion Bannon was violating the law—satisfying the first prong of *Terry*—and proceeded immediately to the second question of whether the officers reasonably believed a limited search of Bannon's person was necessary. *Bannon*, 2015 WL 8588451, at *3. As we conclude that the panel applied the wrong legal test to answer this second question, and the case must be remanded to it for re-evaluation under the correct test, we also focus our attention only on the second prong of the *Terry* analysis.

10

The panel implicitly acknowledged by assuming that the first prong was satisfied, that the legality of a stop or initial seizure of a person does not necessarily validate a subsequent patdown. We agree. See *Terry*, 392 U.S. at 23; *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *Thomas*, 863 F.2d at 628. When addressing the second prong, a reviewing court is

"concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry,* 392 U.S. at 23.

In light of the number of law enforcement officers killed and wounded in the line of duty each year, law enforcement officers have an interest in protecting themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. 392 U.S. at 24.

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24.

The Court of Appeals panel interpreted *Terry*'s second prong to require explicit evidence that the officers conducting a patdown actually, subjectively believed at the time that it was necessary for their own or for public safety. See 2015 WL 8588451, at *3 ("[T]he officers failed to identify they proceeded with the pat-down search and seizure of Bannon because *they* were concerned for their safety or the safety of others." [Emphasis added.]). The precise question before us is whether the test under *Terry*'s second prong—

11

a reasonable suspicion that the person is armed and presently dangerous—is subjective or objective. Must a law enforcement officer testify that he or she actually suspected that a person was armed and presently dangerous?

Courts addressing the subjective/objective distinction are split.

In *United States v. Lott*, 870 F.2d 778 (1st Cir. 1989), for example, the First Circuit held that an officer must have an actual suspicion that weapons are present in addition to that suspicion qualifying as objectively reasonable.

> "Although *Terry* and [*Michigan v.*] *Long*[, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983),] speak in terms of an objective test ('reasonableness') for determining the validity of an officer's frisk for weapons, we do not read those cases as permitting a frisk where, although the circumstances might pass an objective test, the officers in the field were not *actually* concerned for their safety. Indeed, this point seems to be implicit in the Supreme Court's reasoning. *See, e.g., Long,* 463 U.S. at 1049, 103 S. Ct. at 3480 (a search for weapons is allowed 'if the *police officer possesses* a reasonable belief') (emphasis added); *id.* at 1051, 103 S. Ct. at 3482 (police may search if '*they possess*' a reasonable belief) (emphasis added); *id.* at 1052 n. 16, 103 S. Ct. at 3482 n. 16 (in order to search, '*the officer must have* an articulable suspicion') (emphasis added); *Ybarra*[ *v. Illinois*]*,* 444 U.S. [85,] 93, 100 S. Ct. [338, 62 L. Ed. 2d 238 (1979)] (a frisk is permitted by the officer when '*he* reasonably *believes or suspects*' the detainee to be armed) (emphasis added). An officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion.

> Bolstering our conclusion that an officer must have an actual suspicion that weapons are present before a *Terry* search can be made are two further points. First, the Supreme Court and this court have consistently pointed to such facts. *See, e.g., Long,* 463 U.S. at 1036, 103 S. Ct. at 3473 (upon observing knife in car, officer frisked suspect and searched car for additional weapons); *Pennsylvania v. Mimms,* 434 U.S. 106, 107, 98 S. Ct. 330, 331, 54 L. Ed. 2d 331 (1977) (per curiam) (officer performed *Terry* frisk fearing

12

that bulge might be a weapon); [*Adams v.*] *Williams,* 407 U.S. [143,] 145, 92 S. Ct. [1921, 32 L. Ed 2d 612 (1972)] (officer was informed that suspect had a gun in his waist); *Terry,* 392 U.S. at 6, 88 S. Ct. at 1872 (officer feared the suspects might have a gun); *Sibron,* 392 U.S. at 46, 88 S. Ct. at 1894 (officer never suggested he searched out of a fear that suspect was armed and dangerous); *id.* at n. 4, 88 S. Ct. at 1874 n. 4 (same); *id.* at 64, 88 S. Ct. at 1903 (finding a *Terry* frisk invalid in part because officer did not fear suspect was armed and dangerous); *id.* at 21, 88 S. Ct. at 1879; *United States v. Trullo,* 809 F.2d 108, 110 (1st Cir.) (bulge in suspect's pocket), *cert. denied,* 482 U.S. 916, 107 S. Ct. 3191, 96 L. Ed. 2d 679 (1987); *Ballou v. Massachusetts,* 403 F. 2d 982, 985 (1st Cir. 1968) ('the sole focus of suspicion here was that the suspects were armed'), *cert. denied,* 394 U.S. 909, 89 S. Ct. 1024, 22 L. Ed. 2d 222 (1969). Second, where a search has been made without any legal basis, we do not think that an ex post facto reconstruction based upon an argument of objective reasonableness can validate the search. While other officers might have viewed the situation differently, it is the conduct of these officers which we are judging." *Lott*, 870 F.2d at 783-84.

But, more recently, the First Circuit has questioned the continuing validity of requiring a subjective belief.

"It is an open question whether *Lott*'s 'actual fear' analysis is consistent with the Supreme Court's later comment in *Whren* [*v. United States*] that 'the constitutional reasonableness of traffic stops [does not depend] on the actual motivations of the individual officers involved.' 517 U.S. [806, 813, 116. S. Ct. 1769, 135 L. Ed. 2d 89 (1996)]. True, *Whren* held that an officer's subjective intentions were irrelevant to the constitutionality of the traffic stop itself. But its reasoning casts doubt on *Lott*'s holding that an officer's subjective fears must be demonstrated to justify a car search under *Long*[,] even if there is an objectively reasonable basis for an officer to fear for his safety." *United States v. McGregor*, 650 F.3d 813, 821-22 (1st Cir. 2011).

Other circuits also have held or intimated that the subjective belief of officers is irrelevant to the constitutional propriety of a frisk. See *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990) ("As we apply an objective standard of reasonableness to

13

this determination, our conclusion is not changed by [Officer Dan] Bernal's testimony that he had no subjective fear that either [Gregory Lynn] Cummins or [Timothy] Akins were armed."); *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999) (even if evidence had not supported officer's subjective belief suspect armed, test objective); see also *United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (acknowledging split of authority).

In *State v. Warren*, 78 P.3d 590 (Utah 2003), the Utah Supreme Court took a hybrid approach. It considered the existence of an officer's subjective belief or fear, if any, as one factor in the totality of circumstances examined in an objective analysis of the totality of the circumstances.

"Though an officer's subjective belief alone is insufficient to validate or invalidate a *Terry* frisk, to completely disregard an officer's subjective belief excludes a potentially important element of the analysis. . . .

"The totality of the circumstances analysis objectively evaluates all facts before the officer at the time the officer made the decision. The officer, with experience and training, is in the best position to evaluate the circumstances and determine the reasonableness of a *Terry* frisk. We recognize that some officers may never admit that they feared for their safety. Likewise, other officers may always claim they believed a stop was dangerous in order to justify a frisk. Nevertheless, an officer's own evaluation of the circumstances may provide valuable insight to factor into the objective analysis. How much weight this factor is given is a determination for the individual court, though a *Terry* frisk cannot be validated or invalidated based solely on a subjective belief because no one factor alone is determinative of reasonableness. An officer's determination that a person may be armed and dangerous, like an officer's subjective interpretation of the facts to determine that a crime has been or is being committed, is one of several possible articulable facts a court may consider as part of the totality of the circumstances." [Citations omitted.] *Warren*, 78 P.3d at 596.

14

We agree with the Utah Supreme Court that testimony about an officer's subjective belief, if any, may be a factor to consider when applying the objective reasonableness test used for evaluating the constitutionality of a *Terry* frisk. This holding is consistent with this court's earlier observation that reasonableness based on the totality of the circumstances is viewed "'in terms as understood by those versed in the field of law enforcement.'" *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998).

> "'When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances [justifies] the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification," which is "considerably less than proof of wrongdoing by a preponderance of the evidence."' *United States v. Sokolow,* 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 [(1989)]' [*United States v. Mendez*,] 118 F.3d [1426,] 1431 [(10th Cir. 1997)]." *DeMarco*, 263 Kan. at 735.

In short, an officer's subjective fear or belief that a stopped person is armed and presently dangerous is not individually controlling on the question of reasonableness of a frisk. It is not indispensable, but it is not to be ignored.

Because the Court of Appeals panel incorrectly treated the fact that "the officers never testified they were concerned for their safety or the safety of others" as a dispositive negative determinant on the constitutionality of the *Terry* frisk, we reverse its decision and remand this case to the panel to apply the correct legal standard. The question under *Terry*'s second prong is objective:  whether an officer would reasonably suspect that the person stopped is armed and presently dangerous. And any testimony on

15

the officer's actual subjective belief or suspicion on that point is just one factor to consider in the totality of the circumstances.

One final point bears mention. Should the Court of Appeals determine on remand that the gun did not require suppression, it must also consider and rule upon defendant Bannon's other appellate challenge.

## CONCLUSION

The Court of Appeals panel applied the incorrect test to evaluate reasonable suspicion supporting the *Terry* frisk of Bannon. Accordingly, we reverse the Court of Appeals and remand the case to it for consideration under the correct test and for further proceedings as necessary.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.